# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

KENNETH WILSON,

        Plaintiff,

vs.

TK ELEVATORS CORPORATION,

        Defendant.

No.  C24-4041-LTS-MAR

**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

This case is before me on a motion (Doc. 24) for summary judgment by defendant TK Elevator Corporation (TK Elevator).[1]  Plaintiff Kenneth Wilson has filed a resistance (Doc. 27) and TK Elevator has filed two replies.  Docs. 33, 34.  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.     PROCEDURAL HISTORY

I recounted the early procedural history of this case in my order (Doc. 16) on TK Elevator's motion (Doc. 7) to dismiss.  In that order, I granted the motion to dismiss in part, denied it in part and allowed Wilson to file an amended complaint.  Doc. 16 at 13.  Wilson filed an amended complaint (Doc. 17) with jury demand on November 6, 2024.  The amended complaint includes claims for disability discrimination under the Iowa Civil Rights Act (ICRA) (Count 1), disability discrimination under the Americans with Disabilities Act, As Amended (ADA) (Count 2) and age discrimination under the ICRA (Count 3).  Doc. 17 at 3-5. TK Elevator filed an answer (Doc. 20) on November 20, 2024.  Trial is scheduled to begin February 23, 2026.

---

[1] Defendant has previously noted that Wilson has incorrectly identified defendant as "TK Elevators Corporation" while the correct name is TK Elevator Corporation.

## III.   SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there

2

is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## IV.    RELEVANT FACTS

Unless otherwise noted, the following facts are undisputed for purposes of TK Elevator's motion:

TK Elevator is a company "specializing in elevator manufacturing, installation, service, and modernization." Doc. 24-2 at 1 ¶ 1. Through its membership in the National Elevator Bargaining Association (NEBA), TK Elevator was a party to the NEBA collective bargaining agreement (CBA)[2] with the International Union of Elevator Constructors (IUEC). *Id.* at 2 ¶ 5. IUEC Local 33 covers Iowa and South Dakota. *Id.* at 3 ¶ 10. Elevator constructors who are laid off from their employment are placed on

_____

[2] The CBA was effective at all times relevant to this case. *Id.* at 2 ¶ 5.

3

the "bench" for their IUEC local. *Id.* at 2 ¶ 7. If any elevator constructors are on the local bench, constructors from other locals cannot work in that local's territory. *Id.*

On April 14, 2023, TK Elevator hired Wilson from IUEC Local 33's bench. *Id.* at 3 ¶ 10. At the time, Wilson was 53 years old and had worked as an elevator construction mechanic for around 30 years. *Id.* at 1, 2 ¶¶ 2, 4. Over the course of his career, Wilson had worked for TK Elevator on several occasions. *Id.* at 3 ¶ 10. During his most recent stint with TK Elevator, Wilson worked on two projects – one in Sioux Falls, South Dakota, and the other in Sioux City, Iowa. *Id.* at 4, 8 ¶¶ 13, 33. First, Wilson worked on the Cherepa project in Sioux Falls, during which he was supervised by Chris Butek. *Id.* at 4 ¶ 13. After determining that the Cherepa project was not progressing as expected, Butek began to make unannounced visits to determine what was causing the delay and how it could be fixed.[3] *Id.* at 4 ¶ 15.

When Butek visited the site, he became concerned with Wilson's performance. Specifically, Butek was concerned that Wilson spent too much time sitting in a forklift, rather than doing his job, and that Wilson did not understand the material on the worksite or where he should place the material.[4] *Id.* at 5 ¶ 19. Butek discussed his concerns and expectations with Wilson and explained how Wilson could improve. *Id.* 4-5 ¶¶ 16, 20.

On October 25, 2023, Butek verbally warned Wilson about his poor performance, stating that Wilson lacked initiative, did not complete tasks in the time expected, did not assist with tasks as expected and did not seek additional work when he completed tasks.[5] *Id.* at 5 ¶ 21. On November 1, 2023, Butek visited the jobsite and found Wilson "sitting

---

[3] Wilson objects to this fact, claiming that it should be disregarded on summary judgment because it deals with Butek's state of mind. Doc. 27-3 at 4 ¶ 15. I disagree and will discuss this "state of mind" argument below.

[4] Wilson repeats his state of mind objection.

[5] Wilson admits he received the warning but attempts to deny the characterization of the warning. Doc. 27-3 at 6. This attempt fails because the deposition testimony he cites was not included in his appendix. *Id.* (citing P. App. 047 (Wilson dep. p.164:17-165:166:2)).

4

on a forklift that did not belong to [TK Elevator]." *Id.* at 5-6 ¶ 22. When Butek asked Wilson what tasks he was working on, Wilson responded that he was "waiting for direction." *Id.* Butek then directed Wilson to throw out trash. *Id.* at 6 ¶ 23. Instead of just throwing away trash, Wilson also removed two linear door operators from the jobsite. *Id.* Wilson did not fix his mistake until Butek noticed it and told him to retrieve the door operators. *Id.* On November 2, 2023, Butek directed Wilson to start a rail installation project, which he did not complete until November 27, 2023, after he had received a written warning. *Id.* at 6-7 ¶¶ 24, 31.

Under the CBA, TK Elevator could not fire an employee for unsatisfactory performance without providing a written warning and giving the employee time to fix the performance issues. *Id.* at 7 ¶ 32. Butek told Neil Palazzolo, TK Elevator's Director of New Install, about issues with Wilson's performance, such as Wilson failing to timely complete tasks, follow safety policy, arrive to work on time, stay at the job site during scheduled times and follow mandated break times. *Id.* at 6 ¶ 25. Butek also relayed his concerns about Wilson's job performance to Jack Upchurch, TK Elevator's Vice President of Labor Relations. *Id.* ¶ 26. After Butek, Palazzolo and Upchurch spoke via telephone about Wilson's performance issues, Butek wrote a warning letter detailing Wilson's poor job performance. *Id.* at 6-7 ¶¶ 27-28; Doc. 24-5 at 3.

On November 27, 2023, Wilson received the warning letter, which stated that Wilson was not satisfactorily performing his job because he did not "complete work tasks within the expected time frame," "assist with tasks as expected" or ask for additional work when he had completed assignments. Doc. 24-2 at 7 ¶¶ 28-29. In addition, the letter referenced the October 25, 2023, verbal warning, the November 1, 2023, incident with the linear door and the November 2, 2023, rail installation task, which Wilson did not complete until after he had received Butek's letter. *Id.* at 7 ¶¶ 29, 31. The letter warned that if Wilson did not improve his performance, TK Elevator would terminate his employment. *Id.* ¶ 29

5

On January 16, 2024, TK Elevator transferred Wilson to Sioux City, where he began to work on the Benson Building project. *Id.* at 8 ¶ 33. TK Elevator's New Installation Superintendent, Danny Troutman, supervised Wilson on that project. *Id.* On elevator construction projects, workers are assigned to work in pairs. *Id.* at 2 ¶ 8. Wilson worked in a pair with Tony Molnar, who was the lead mechanic on the project. *Id.* at 8 ¶¶ 35-36. Molnar directed Wilson's work. *Id.*

While employed by TK Elevator, Wilson weighed roughly 460 pounds. *Id.* at 1 ¶ 3. On their first day working together, Wilson told Molnar he was "a Krispy Kreme away from 500 pounds."[6] *Id.* at 8 ¶ 37. That same day, Molnar told Wilson: "I'm a father of three and I'd like to go home the same way I came to work - safe." *Id.* at 9 ¶ 44. The Benson Building project was eight stories tall. *Id.* Molnar asked Wilson whether Wilson would be able to get up to the eighth floor to help Molnar if he were injured on that level. *Id.* Although Wilson said he would be able to climb the stairs to the eighth floor (Doc. 27-3 at 10-11), Molnar remained concerned that Wilson would not be able to assist him.[7] Doc. 24-2 at 10 ¶ 45. Adding to Molnar's concern was that when he watched Wilson scale the one flight of stairs needed to enter the Benson Building each day, he believed Wilson struggled to do so. *Id.* at 9 ¶ 39.

Molnar also believed Wilson could not complete several tasks safely and did not request Wilson's help with these tasks. *Id.* at 10 ¶ 48. When an elevator is installed in a building, the mechanic must be able to access the elevator pit. *Id.* at 9 ¶ 40. In the Benson Building, the pit was 12 feet deep and could be reached only by climbing down a ladder with a weight limit of 300 pounds. *Id.* at 9 ¶¶ 40-41. Molnar felt uncomfortable

---

[6] In his attempt to controvert this fact (Doc. 27-3 at 9), Wilson points to an affidavit (Doc. 27-4 at 75) in which he states he "never told Molnar how much I weighed." Wilson does not deny making the comment to Molnar and the fact is left uncontroverted.

[7] Wilson repeats his state of mind objection with regard to facts concerning Molnar's state of mind in the remainder of this paragraph and in the next paragraph.

asking Wilson to perform job tasks requiring the ladder because he believed that Wilson exceeded the ladder's weight limit. *Id.* ¶ 42. Molnar worried that if Wilson broke the ladder, he would be unable to help Wilson. *Id.* Because he was concerned about Wilson's safety, Molnar did not ask Wilson to perform duties requiring the ladder, "even though the job required it." *Id.* ¶ at 43.

When Molnar asked Wilson to complete tasks, Wilson did not complete them to Molnar's satisfaction.[8] *Id.* at 10 ¶¶ 49-50. When Molnar asked him to prepare door frames, he prepared them only halfway. *Id.* ¶ 49. After Wilson worked on the door frames, they were not ready to be installed because he did not fully tear the plastic off the door frames or put components on the door frames. *Id.* Molnar also found that Wilson did not complete tasks at the level he expected from a mechanic.[9] *Id.* at 10 ¶ 50. In fact, he found Wilson completed tasks only half as well as would be expected of a helper or apprentice. *Id.*

While paired with Wilson, Molnar contacted Troutman about safety concerns related to working with Wilson and Wilson's failure to contribute to work on the elevator construction project. *Id.* ¶ 46. Molnar told Troutman that he did not feel comfortable working with Wilson because if either of them "got hurt on the job, neither would be able to assist each other." *Id.* Molnar also told Troutman about how the work was allocated between him and Wilson, saying he was doing the bulk of the pair's work while Wilson was only performing preparation work. *Id.* ¶ 47. Wilson and Molnar used rope and a capstan hoist to pull rails up the elevator shaft, a task that required bending over.

---

[8] Wilson attempts to controvert this by claiming that he completed everything he was asked to do. Doc. 27-3 at 11. However, as TK Elevator notes, this does not controvert that Wilson did not complete the work as Molnar expected. Doc. 33 at 8. Further, Wilson does not point to evidence showing that Molnar told him to prepare door frames only halfway. *Id.* I find this uncontroverted.

[9] Wilson claims he did everything Molnar asked. Doc. 27-3 at 11. This does not controvert the stated fact.

*Id.* at ¶ 38.  Molnar told Troutman that Wilson could not attach the capstan hoist without struggling.  Doc. 27-2 at 1 ¶ 6.

After receiving Molnar's complaints, Troutman spoke to Wilson.  Doc. 24-2 at 10-11 ¶ 51.  Troutman told Wilson that Molnar was concerned Wilson would not be able to climb the eight flights to rescue Molnar if he were injured.  *Id.*  Troutman was also concerned that if Wilson could not climb the stairs quickly to help if Molnar was injured, this could cause Molnar's condition to get worse.[10]  *Id.*

After this conversation with Wilson, Troutman shared concerns about Wilson's poor work and safety performance with other members of management – Greg Rodenburg, Palazzolo and Upchurch.  *Id.* at 11 ¶ 54.  Troutman told Palazzolo that Molnar struggled to work on a team with Wilson because Wilson did not do the work he needed to complete, which meant Molnar did most of the work.[11]  *Id.* ¶ 55.  Later, on January 23, 2024, Troutman emailed Palazzolo and Rodenburg to update them on Wilson's job performance and share his concerns.  *Id.* at 11-12 ¶ 56.  In the email, Troutman expressed six concerns about Wilson's performance: (1) because of Wilson's personal capabilities, he could only be assigned busy work, (2) Wilson could not use a ladder because no ladders were rated to his weight, (3) Wilson could not bend over, which prevented him from attaching a hoist rope to the captain hoist, (4) Wilson could not assemble anything in the overhead or do any rigging because he could not get on a ladder, (5) Wilson could not access the elevator pit and (6) Molnar was performing the bulk of the work while Wilson cleaned rails and prepped entrances.  *Id.*  Palazzolo sent Troutman's concerns to Upchurch.  *Id.* at 12 ¶ 57.  Palazzolo, Troutman, Rodenburg and Upchurch decided to terminate Wilson's employment.  *Id.* ¶ 58.

---

[10] Wilson repeats his state of mind objection.

[11] Wilson attempts to controvert this fact but fails.  Doc. 33 at 8-9 (correctly explaining how "nothing in Plaintiff's response actually controverts" this fact).

When TK Elevator discharged Wilson, Troutman knew there were concerns about Wilson's performance on the Cherepa Project. *Id.* ¶ 59. Troutman also knew that Wilson had received verbal and written warnings on the project but Troutman had not reviewed the warning letter or discussed the warnings with Butek. *Id.*; Doc. 33 at 14-15 ¶¶ 23-24. Troutman felt it was unnecessary to observe Wilson working, or ask him to perform tasks, before discharging Wilson, because he trusted Molnar and Molnar was responsible for the project's performance and safety.[12] Doc. 24-2 at 12 ¶ 61.

Upchurch drafted Wilson's termination letter based on the deficiencies listed in the warning letter, conversations regarding Wilson's performance and information from Troutman about Wilson's performance on the project. *Id.* at 13 ¶ 62. The letter stated that TK Elevator was notifying Wilson under the CBA that it found he had failed to satisfactorily fulfill his responsibilities. *Id.* ¶ 63. The letter also stated:

> You have previously been warned both verbally and in writing about the performance deficiencies that exist. The Company has determined that you have continued to perform [your] job duties at a level well below that expected of a Mechanic with your tenure and years of experience in the elevator industry. Specifically, a review of your recent work at your jobsite at the Benson Building indicates that you are physically unable to perform numerous tasks associated with your position – such as accessing a ladder, accessing a pit, assembling items in the overhead or rigging from a ladder. The limitations in your duties negatively impact the efficiency and productivity on a jobsite, to a degree that the company is no longer willing to accept. Given the totality of circumstances and your previous warning letter, the Company has determined that it can no longer tolerate your performance level and has elected to terminate your employment effective today.

*Id.* (alterations in original). Troutman, Palazzolo and Rodenburg gave Wilson the termination letter during a meeting on January 24, 2024.

---

[12] Wilson repeats his state of mind objection. His second objection that "the concerns Troutman reported were not concerns reported to him by Molnar" is overbroad because, as established above, Molnar shared both safety and workload concerns with Troutman.

9

At the time TK Elevator terminated Wilson's employment, he was 54 years old. *Id.* at 2, 13 ¶¶ 4, 64. A 35-year-old apprentice from another IUEC local temporarily replaced Wilson for three days while TK elevator waited for his permanent replacement – a 63-year-old member of Local 33 - to complete another job.[13] *Id.* at 14 ¶¶ 67-68; Doc. 24-15 at 127 ¶ 11. Once the 63-year-old permanent replacement finished the other job, he worked on the Benson Building project through its completion. Doc. 24-2 at 14 ¶¶ 68-69.

While Wilson worked at TK Elevator, no one from the company made negative comments to him about his age or weight.[14] *Id.* ¶ 71. During his employment, Wilson never provided TK Elevator with health-related documents or told TK Elevator management about any health or medical conditions. *Id.* at 14 ¶ 72. No one at TK Elevator told him they feared he could not perform his job duties due to "stereotypes associated with impairments related to or caused by excessive weight." *Id.* at 15 ¶ 74.

## V.    DISCUSSION

TK Elevator seeks summary judgment on all claims asserted in Wilson's amended complaint. Doc. 24 at 1. I will address each claim in turn. As a preliminary matter, I must address Wilson's state of mind objections to determine whether I may properly consider these facts at the summary judgment stage.

---

[13] TK Elevator omitted the permanent replacement employee's age in its statement of facts. Doc. 24-2 at 14 ¶¶ 67-69.

[14] Wilson admits no one made direct negative comments to Wilson but claims "Troutman's email and termination letter contain[] ageist remarks." Doc. 27-3 at 16. In this response, Wilson does not specify which remarks were ageist. *Id.* However, these remarks appear to be those about Wilson's efficiency. These concerns are addressed below.

10

## A.    State of Mind Objections

Wilson objected to 10 of TK Elevator's material facts because they dealt with the witness's "state of mind."[15]  Doc. 27-3.  Wilson argued that these facts were impossible to contradict with record evidence "and should be disregarded for purposes of summary judgment."  *See, e.g.*, *id.* at 4 ¶ 15.  In support of this position, Wilson quotes *Terrell v. City of Harris Police Department*, 549 F. Supp. 2d 671 (M.D. Penn. 2008), in which the court stated: "Allegations pertaining to a witness's state of mind will remain controverted, as they are beyond plaintiffs' ability to obtain contrary evidence."  *Id.* at 676 n.2

Wilson takes this quote out of context.  In *Lovland v. Employers Mutual Casualty Co.*, No. 4:09-CV-522-HDV-TJS, 2011 WL 13187245, (S.D. Iowa Apr. 12, 2011), *aff'd*, 674 F.3d 806 (8th Cir. 2012), the court considered the plaintiff's use of the same quote for the same purpose.  *Id.* at *6-7.  The *Lovland* court noted that in the same footnote, the *Terrell* court stated:

> [Employment] discrimination cases frequently require an inquiry into the defendant's state of mind to determine whether the defendant's actions were motivated by [prohibited bases].  Nevertheless, [f]aced with a properly supported summary judgment motion, however, a plaintiff [alleging discrimination] must come forth with some evidence sufficient to create a genuine issue of material fact.

*Id.* at 7[16] (quoting *Terrell*, 549 F. Supp. 2d at 676 n. 2) (citation modified).

Here, as is common in employment discrimination cases, it is necessary to inquire into the state of mind of various TK Elevator employees to determine whether discriminatory bases motivated their decision to fire Wilson.  If deposition testimony is inadmissible, a court cannot consider it on summary judgment.  *Brooks v. Tri-Sys., Inc.*,

---

[15] Wilson objected on this basis to ¶¶ 15, 19, 39, 42, 43, 45, 48, 51, 61 and 73.  Doc. 27-3.

[16] Wilson's counsel was the counsel for the plaintiff in *Lovland*.

425 F.3d 1109, 1112 (8th Cir. 2005). Wilson has not alleged that the relevant deposition testimony is inadmissible, only that it is inappropriate for summary judgment. *See, e.g.*, Doc. 27-3 at ¶ 15. Each of TK Elevator's "state of mind" facts are supported by sworn deposition testimony cited in its appendix. Doc. 24-2. As Wilson acknowledges by arguing that these facts are based on each witness's "state of mind," they are inherently based on personal knowledge. Because this testimony is admissible, I will consider it on summary judgment. Once TK Elevator, as the moving party, meets its burden of showing that an alleged fact is supported by the record, the burden shifts to Wilson to set forth evidence to create a genuine issue of material fact. He has established no such facts. Therefore, these facts remain uncontroverted for purposes of summary judgment.

**B.      *Wilson's Disability Discrimination Claims (Counts I and II)***

Wilson has brought claims of disability discrimination under the ADA and ICRA. Doc. 17 at 3-4. I will analyze these claims together because courts analyze these "disability discrimination claims under the same standards."[17] *Gardea v. JBS USA, LLC*, 915 F.3d 537, 541 (8th Cir. 2019). The ADA and ICRA prohibit employers from discriminating against individuals on the basis of disability. 42 U.S.C. § 12112(a); Iowa Code § 216.61. A prima facie case of disability discrimination requires the plaintiff to show he: (1) had a disability within the meaning of the relevant statute, (2) was qualified to perform the essential functions of his job with or without reasonable accommodation and (3) suffered an adverse employment action because of his disability. *Higgins v. Union Pacific Railroad Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (citing *Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 996-97 (8th Cir. 2014)).

---

[17] While Iowa courts look to federal statutes in interpreting the ICRA, the ICRA is not to be construed more narrowly than those statutes. *See Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 9-10 (Iowa 2014).

12

A plaintiff can demonstrate discrimination through direct evidence or by raising an inference of discrimination through the *McDonnell Douglas* burden-shifting framework. *See St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012). "Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets his burden of establishing a prima facie case of employment discrimination." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014); *see also Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 268 (Iowa 2019). The burden then shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for its action. *Young*, 754 F.3d at 577–78. If the defendant does so, the burden shifts back to the plaintiff to show that the reason for the defendant's actions is a pretext for unlawful discrimination. *Id.*; *see also McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009). Although courts normally consider evidence of pretext "at step three of the *McDonnell Douglas analysis*, [it] can satisfy the inference-of-discrimination element of the prima facie case." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

### 1. *Disability Under Relevant Statutes*

Under the ADA, a disability is defined as a physical or mental impairment that substantially limits one or more major life activities and also includes being regarded as having such an impairment. 42 U.S.C. § 12102(2)(A) & (C). Physical or mental impairments include "[a]ny physiological disorder or condition . . . affecting one or more body systems . . . ." 29 C.F.R. § 1630.2(h)(1). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3).

13

The ICRA defines disability as "the physical or mental condition of a person which constitutes a substantial disability."[18]  Iowa Code § 216.2(5).  The regulations for this statute provide "[t]he term 'substantially handicapped person' shall mean any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment."  Iowa Admin. Code r. 161-8.26(l).  A person is 'regarded as having an impairment' if he:

a.  Has a physical or mental impairment that does not substantially limit major life activities but that is perceived as constituting such a limitation;

b.  Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

c.  Has none of the impairments defined to be "physical or mental impairments," but is perceived as having such an impairment.

*Id.* at r. 161-8.26(5).

"Under the ADA, being regarded as disabled by an employer can suffice to establish a disability within the meaning of the statute if the plaintiff shows that his employer subjected him to an adverse action 'because of an actual or perceived physical or mental impairment. . . .'"  *Sanders v. Union Pacific Railroad Co.*, 108 F.4th 1055, 1060 (8th Cir. 2024) (quoting *Fischer v. Minneapolis Pub. Schs.*, 792 F.3d 985, 988 (8th Cir. 2015)).

"A plaintiff cannot state a claim under the 'regarded as' prong of the ADA . . . simply by alleging that the employer believes some physical condition, such as height, weight, or hair color, renders the plaintiff disabled.  Rather, the plaintiff must allege that the employer believed, however erroneously, that the plaintiff suffered from an

---

[18] The statute does not define "substantial disability."

'impairment' that, if it truly existed, would be covered under the statutes and that the employer discriminated against the plaintiff on that basis." *Francis v. City of Meriden*, 129 F.3d 281, 285 (2d Cir. 1997). *See also Adler v. I&M Rail Link, L.L.C.*, 13 F. Supp. 2d 912, 938 (N.D. Iowa 1998) (requiring plaintiffs to replead perceived disability claims by identifying each plaintiff's specific impairment or injury).[19]

Obesity alone is not an impairment. Instead, "an individual's weight is generally a physical characteristic that qualifies as a physical impairment only if it falls outside the normal range *and* it occurs as the result of a physiological disorder. Both requirements must be satisfied before a physical impairment can be found." *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1108 (8th Cir. 2016) (emphasis in original). In my ruling on the motion to dismiss, I explained that in order for Wilson to present a viable "regarded as" claim, he must "allege the specific impairment TK Elevator perceived him to have." Doc. 16 at 9.

Wilson has still provided no affirmative evidence that TK Elevator believed his obesity stemmed from a physiological disorder, as *Morriss* requires. Rather than addressing *Morriss*' binding precedent, Wilson doubles down in his belief that "[m]orbid obesity alone has been found to constitute a physical impairment sufficient to withstand summary judgment." Doc. 27-1 at 12. This allegation is contrary to the Eighth Circuit's binding holding in *Morriss* "that for obesity, even morbid obesity, to be considered a physical impairment, it must result from an underlying physiological disorder or condition." 817 F.3d at 1112.

---

[19] *Francis* and *Adler* pre-date the 2008 amendments to ADA. Those amendments provided that a plaintiff no longer must prove that a perceived impairment substantially limits a major life activity or is perceived to limit a major life activity. The amendments did not change the definition of physical impairment, which requires an underlying physiological disorder or condition. *See Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1112-13 (8th Cir. 2016); *see also Brownwood v. Wells Trucking, LLC*, No. 16-cv-01264, 2017 WL 9289453, at *6 (D. Colo. Nov. 9, 2017) ("The Court is further persuaded that the passage of the ADAAA did not fundamentally alter the definition of 'impairment' or call into question the validity of prior judicial decisions holding that obesity, by itself, does not qualify.").

Confusingly, Wilson also claims TK Elevator treated him like he had musculoskeletal or cardiovascular impairments. *Id.* at 8. Although he does not support this claim with citations to the record, he alleges he has shown evidence for a reasonable jury to conclude TK Elevator perceived him "to have a musculoskeletal or cardiovascular impairment." *Id.* at 12. However, "[m]ere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007).

Wilson claims that "Troutman's perception of the extent of Wilson's disability is expansive" because he "believed Wilson could not bend over, climb a ladder, access a pit, assemble items in the overhead or rig from a ladder." Doc. 27-1 at 8. Wilson further attempts to escape the confines of *Morriss* by alleging that because TK Elevator's employees believed he could not perform tasks due to his weight, this meant they believed he was disabled. *Id.* at 7-10. However, under *Morriss*, unless obesity occurs as "the result of a physiological disorder," it is a physical characteristic, not a physical impairment. *Morriss*, 817 F.3d at 1108. Therefore, Wilson's inability (or perceived inability) to perform these tasks would relate to a physical characteristic, not an impairment.

Finally, Wilson argues he was discriminated against "based on a stereotype that an obese person is physically impaired from performing major life activities." Doc. 27-1 at 10. He argues that because he was obese, TK Elevator must have believed he had "physical impairments that interfered with his performance of his job functions and posed a risk to others." *Id.* at 11. Again, Wilson's weight is a physical characteristic. Further, as I advised Wilson in my prior ruling, Wilson must identify the specific impairment TK Elevator perceived. He has not. Because Wilson fails to show his obesity stemmed from a physiological disorder, he has failed to satisfy the first element of a prima facie case by showing that he was disabled or was regarded as such. Therefore, TK Elevator is entitled to judgment as a matter of law on Wilson's disability discrimination claims under the

ADA and the ICRA. Nonetheless, I will address the remaining elements of the prima facie case.

### 2. Qualified for Position

In *Garang v. Smithfield Farmland Corp.*, 439 F. Supp. 3d 1073 (N.D. Iowa 2020), I discussed the difficulty courts have had in applying the second element of the prima facie case. *Id.* at 1084-87. Two interrelated tests have developed to determine whether a plaintiff was qualified for their job. *Id.* In sum, plaintiffs may satisfy the second element by showing that they either (1) met the employer's legitimate performance expectations or (2) were otherwise qualified. *Id.* Neither standard "perfectly encapsulates the second element in every case." *Id.* at 1086.

"[B]oth articulations are interrelated and, fundamentally, share the same purpose: helping determine whether a presumption that the defendant discriminated against the plaintiff is appropriate." *Id.* If Wilson has not shown he was qualified for his position as an elevator mechanic, "or that he was meeting [TK Elevator's] minimum expectations, 'the inference that he would not have been fired had he not been a member of a protected group is very weak—so weak that the factfinder should not be allowed to speculate on the motive for the termination.'" *Id.* at 1086–87 (quoting *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997)).

Under the "employer's legitimate expectation" articulation, Wilson is unlikely to show he was qualified. Wilson had received both verbal and written warnings and continued to have performance issues even after receiving these warnings. *See Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) (teacher was not meeting employer's legitimate expectations because she had been notified repeatedly of her deficient performance and failed to cure it). However, Wilson can likely show he was otherwise qualified for his position. Although TK Elevator argues he was not otherwise qualified because it claims he could not complete portions of his job duties, Doc. 34 at 5-6, he had been an elevator mechanic for roughly 30 years. *Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008) (determining plaintiff was otherwise qualified for a position because

17

he had been performing the position successfully for years).  Under this standard, Wilson can likely show he was otherwise qualified.  Therefore, TK Elevator is not entitled to summary judgment based on the second element of the prima facie case.

### 3.     *Adverse Employment Outcome Because of Disability*

"The third element of the prima facie case requires a showing that the person suffered an adverse employment action due to the disability."  *Chalfant v. Titan Distribution, Inc.*, 475 F.3d 982, 990 (8th Cir. 2007).  As discussed above, Wilson has not shown that he had a disability under the ICRA or ADA, but I will still consider this element.  Wilson attempts to satisfy the inference of discrimination element of the prima facie case by showing pretext.[20]  Doc. 27-1 at 15.

### 4.     *Pretext*

TK Elevator argues that Wilson cannot establish a prima facie case of disability discrimination because he has not provided evidence that he is disabled or perceived as disabled, has not shown he was qualified for his position and has not shown that he was discharged because of his disability.  TK Elevator further argues that even if Wilson can establish a prima facie case, he cannot show that TK Elevator's stated legitimate, nondiscriminatory reason for discharge was pretext.  Wilson argues that he can establish a prima facie case and that he can show the stated reason for termination was pretextual.

"[I]f an employer has articulated a legitimate reason for its actions, it is permissible for courts to presume the existence of a prima facie case and move directly to the issue of pretext . . . ."  *Stewart v. Indep. Sch. Dist. No.* 196, 481 F.3d 1034, 1043 (8th Cir.

---

[20] *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) ("Evidence of pretext, normally considered at step three of the *McDonnell Douglas* analysis, can satisfy the inference-of-discrimination element of the prima facie case.").

2007). Even if Wilson could establish a prima facie case of disability determination, the parties do not appear to contest that TK Elevator has articulated a legitimate, non-discriminatory reason for terminating Wilson - continued performance issues. Performance issues are legitimate, nondiscriminatory reasons for an employer to discharge an employee. *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014). Wilson does not claim the stated reason is an improper reason for discharge, but argues that "a jury could find this explanation false." Doc. 27-1 at 18.

The burden thus shifts to Wilson to show pretext. To do so, he must present sufficient evidence that TK Elevator's stated reason is false and that discrimination was the real reason for his discharge. *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010) (citing *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008)) (per curiam). "Because the employer's 'motive and intent are at the heart of a discrimination case,' the central inquiry 'is whether [disability] was a factor in the employment decision *at the moment it was made*.'" *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 570 (8th Cir. 2007) (quoting *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 403 (1st Cir.1990)) (alteration and emphasis in original). "[E]vidence of pretext and discrimination is viewed in light of the employer's justification." *Chappell v. Bilco Co.*, 675 F.3d 1110 (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)).

To show that the employer's reason was false, a plaintiff may argue, among other things, that the discharge contravened the employer's own policy or practice, that the employee was complying with the employer's reasonable expectations at the time of termination or that the employer treated the employee differently than similarly situated employees. *Canning v. Creighton Univ.*, 995 F.3d 603, 612–13 (8th Cir. 2021). However, Wilson "must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Winters v. Deere & Co.*, 63 F.4th 685, 690 (8th Cir. 2023) (quoting *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998)).

19

Wilson argues that TK Elevator's claim that it discharged him for continued performance issues is pretextual. Doc. 27-1 at 18. Wilson's argument is two-fold. First, he claims his termination letter did not cite performance issues and only addressed Wilson's perceived physical limitations. *Id.* He acknowledges that the warning letter stated that he did not "complete work tasks within the expected time frame, assist with tasks as expected, and request additional work when assignments are complete, lacking initiative." *Id.* Wilson thus argues he was discharged only for physical limitations. *Id.*

As TK Elevator notes, however, Wilson ignores that his termination letter incorporates the performance issues in the warning letter, stating "[g]iven the totality of circumstances and your previous warning letter, the Company has determined that it can no longer tolerate your performance level and has elected to terminate your employment effective today." Doc. 34 at 7 (quoting Doc. 24-2 at 13 ¶ 63). TK Elevator also notes: "Not performing routine tasks and an inability to perform routine tasks are not mutually exclusive, and [Wilson] offers no evidence to the contrary. The physical inability to perform the required tasks of a TKE Mechanic is unquestionably an issue of performance." Doc. 34 at 8. Wilson's first argument regarding pretext fails as a matter of law.

Next, Wilson argues that TK Elevator's stated beliefs render his discharge pretextual. Doc. 27-1 at 18. This argument is split into three parts. First, Wilson argues TK Elevator's "decision to terminate Wilson based on the decisionmakers' personal opinions and perception of Wilson's physical capabilities, without observing Wilson being unable to perform any of his job functions, is the very definition of unlawful discrimination based on a perceived disability." *Id.* Wilson argues that because TK Elevator had only a good faith belief he could not perform routine tasks, rather than actual evidence, this shows TK Elevator discriminated against him on perceived disability grounds "because it could not be based on anything more than beliefs, fears and stereotypes about people with morbid obesity and/or cardiovascular impairments." *Id.* at 18-19.

In response, TK Elevator argues it had numerous pieces of actual evidence, rather than just a good faith belief, that Wilson could not perform job-required tasks. Doc. 34 at 8. In support of this, TK Elevator argues Wilson could not use the ladders on the jobsite and struggled to attach the capstan hoist. *Id.* Because this analysis dovetails with Wilson's third argument, I will discuss this at more length below.

Second, Wilson claims that TK Elevator cannot use the good faith argument because his physical inability "to complete tasks[] is inextricably intertwined with the perceived disability claim." Doc. 27-1 at 19. In support of this, he cites *Pye v. Nu Aire, Inc.*, 641 F.3d 1011 (8th Cir. 2011). In *Pye*, the court considered a retaliation claim. *Id.* at 1020-23. The plaintiff had filed an internal discrimination complaint, which the court determined qualified as protected conduct. *Id.* at 1020. The defendant claimed that it had terminated the plaintiff's employment because of his alleged behavior during the internal investigation. *Id.* at 1022-23. The court viewed "the proffered reason for termination [as] inextricably intertwined with the protected conduct at issue." *Id.* Because there was a factual dispute about whether the plaintiff had engaged in "intimidation, coercion, and threatening behavior" during the investigation, the court held that a reasonable jury could find the defendant's stated reasons pretextual. *Id.*

The facts here are entirely unlike those in *Pye*. First, Wilson has not shown that he was disabled or that TK Elevator perceived him as such. Second, TK Elevator has shown that it had longstanding concerns about Wilson's work behavior through a verbal warning, a written warning and finally his termination letter. Against this backdrop, TK Elevator's stated reasons for terminating Wilson are not "inextricably intertwined" with a discriminatory rationale. Therefore, this argument fails.

Third, Wilson argues that even if good faith applies, "there is a genuine issue as to [TK Elevator's] good faith belief." Doc. 27-1 at 20. He argues a genuine issue exists because TK Elevator's "belief comes from Troutman, who testified he got the information form Molnar." *Id.* Wilson alleges that Molnar reported only safety concerns to Troutman, not concerns about Wilson's physical abilities. *Id.*

21

In response, TK Elevator argues that it is not necessary for Molnar to have reported Wilson's physical inabilities to Troutman for good faith belief to exist. Doc. 34 at 8. TK Elevator claims Wilson would not have been able to perform his job duties that required a ladder "because he exceeded the weight limit." *Id.* TK Elevator notes also that Molnar had told Troutman that Wilson struggled to use the capstan hoist and that Molnar performed the bulk of the pair's work. *Id.* Based on these undisputed facts, TK Elevator argues that Troutman had a good faith belief that Wilson could not complete tasks requiring him to use a ladder. *Id.*

TK Elevator also notes that Wilson failed to address whether TK Elevator's decisionmakers[21] had a good faith belief that Wilson could not perform his job responsibilities and duties when they knew about his documented warnings and that he would not be able to perform activities requiring a ladder. *Id.* at 8-9. TK Elevator also observes that although Wilson's perceived disability hinges on how Troutman perceived him, the decisionmakers received information about Wilson's poor work performance outside of Troutman. *Id.* at 9.

In Sioux Falls, Butek had complained about Wilson's performance to Palazzolo and Upchurch. *Id.* Butek had told Palazzolo that Wilson failed to complete tasks in appropriate timeframes, failed to follow the project's safety policy, failed to follow instructions, failed to arrive to work on time and failed to adhere to company and CBA-mandate break times. *Id.*; Doc. 24-2 at 6 ¶ 25. Butek had also told Upchurch about his concerns regarding Wilson's performance. Doc. 24-2 at 6 ¶ 26. After Butek, Palazzolo and Upchurch spoke on the phone, TK Elevator drafted Wilson's warning letter. Doc. 34 at 9. Based on these undisputed facts, this theory of pretext fails.

For all of these reasons, Wilson has failed to put forward sufficient evidence that TK Elevator's stated reasons are false and that discrimination was the real reason for his

---

[21] TK Elevator's decisionmakers were Palazzolo, Troutman, Rodenburg and Upchurch. Doc. 34 at 8.

discharge. For this additional and alternative reason, TK Elevator is entitled to summary judgment on his ADA and ICRA disability discrimination claims.

## C.    Age Discrimination Claim

Under the ICRA, it is "an unfair or discriminatory practice . . . to discharge any employee, or to otherwise discriminate in employment . . . because of the age, race, creed, color sex, sexual orientation, gender identity, national origin, religion, or disability of such applicant or employee, unless based upon the nature of the occupation." Iowa Code § 216.6(1)(a). For Wilson's age discrimination claim to survive summary judgment, he must show (1) he was a member of a protected group, (2) was qualified for his position and (3) the circumstances of his discharge raise an inference of discrimination. *See Feeback v. Swift Pork Co.*, 988 N.W.2d 340, 347-48 (Iowa 2023). Under the ICRA, a plaintiff must show only that age "played a part" in the adverse employment decision and need not prove age was the only reason. *See Newberry v. Burlington Basket Co.*, 622 F.3d 979, 982 (8th Cir. 2010) (citing *DeBoom v. Raining Rose Inc.*, 772 N.W.2d 1, 13 (Iowa 2009)). ICRA age discrimination claims use the same *McDonnell Douglas* burden-shifting framework described above. *Hedlund v. State*, 930 N.W.2d 707, 720 (Iowa 2019), *as amended* (Sept. 10, 2019).

TK Elevator agrees that Wilson was a member of a protected group. Doc. 24-1 at 16. As for the second element of a prima facie case, I have found that Wilson has met his burden of showing that he was qualified for his position. As with his disability discrimination claims, Wilson has chosen to attempt to satisfy the third element (inference of discrimination) with evidence of pretext. Doc. 27-1 at 21.

To demonstrate that TK Elevator's stated reasons for his discharge are pretext, Wilson relies on two inferential arguments. *Id.* at 21-22. First, he argues that because his weight was the same the entire time he worked for TK Elevator, "the only difference . . . was his age." *Id.* at 21. From this, Wilson argues that "[a] reasonable jury could find that [TK Elevator] was not concerned about [his] weight, ability to climb a ladder

23

quickly, or its impact on his ability to do physical tasks until he got older. *Id.* This argument fails to allow a reasonable jury to find that age was the reason for Wilson's termination because it ignores the well-documented concerns regarding his performance.

Next, Wilson argues that when viewed in his favor, "Troutman's alleged concerns about Wilson being physically unable to bend over, climb stairs quickly, get on a ladder [and] climb down into the pit," when paired with his comments about Wilson's limited "efficiency and production," were "stereotypically ageist and [] evidence of age discrimination." *Id.* In support of this claim, Wilson cites two cases: *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993), and *Bleimehl v. Eastman Kodak Co.*, No. CIV.4-93-CV-30702, 1997 WL 33322218 (S.D. Iowa Jan. 27, 1997). Doc. 27-1 at 21-22. Wilson cites these cases to suggest Troutman's "efficiency and production" comments were ageist but does not try to tie these cases to Troutman's alleged concerns about Wilson's physical abilities. *Id.*

Wilson quotes the Court's observation in *Hazen* that: "It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." 507 U.S. at 610. However, Wilson takes this quote out of context. In *Hazen*, the issue was "whether an employer violates the ADEA by acting on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age." *Id.* at 608. The Court clarified "that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." *Id.* at 609. As TK Elevator notes, Wilson has failed to show that Wilson's deficient performance, including his failure to perform routine tasks, relates to his age. Doc. 34 at 12. Wilson also admits that while he worked at TK Elevator, "no one ever made negative comments" directly to him regarding his age. Doc. 24-2 at 14 ¶ 71; Doc. 27-3 at 16 ¶ 71.

In *Bleimehl*, the court considered whether a jury properly concluded that the plaintiff suffered from age discrimination. 1997 WL 33322218, at *5-6. The plaintiff's supervisors made several comments about the plaintiff including that he was "not keeping

24

up with the times," failed to show a "sense of urgency," lacked "intensity," "and that he needed to get 'revved up.'" *Id.* at *5. The court observed that "[c]omments like these may be innocent and factual, but in context may reflect age stereotyping about [] productivity and competence which is 'the very essence of age discrimination.'" *Id.* (quoting *Hazen*, 507 U.S. at 609). As TK Elevator notes, the supervisors in *Bleimehl* made "*several* comments that could reflect age stereotyping about the plaintiff's productivity." Doc. 34 at 12 (emphasis in original). Troutman made only one comment about Wilson's "efficiency and production." *Id.* When viewed against the backdrop of concerns about Wilson's work, including Molnar telling Troutman that he was completing the bulk of the work and that Wilson was only completing preparation work, Doc. 24-2 at 10 ¶ 47, this case is not like *Bleimehl*.

The lack of evidence to support a finding of pretext is further illustrated by the age of Wilson's permanent replacement. "Although replacement by substantially younger employees may allow for an inference of discrimination, the 'important datum' is the age of [the] permanent replacement . . . ." *Nash v. Optomec, Inc.*, 849 F.3d 780, 784 (8th Cir. 2017). When TK terminated Wilson's employment, he was 54 years old. Doc. 24-2 at 2 ¶ 4. A 35-year-old IUEC apprentice from another IEUC local temporarily replaced him for three days while his permanent replacement completed another job. *Id.* at 15-16 ¶¶ 66-69. Wilson's permanent replacement was a 63-year-old mechanic from Wilson's IUEC local. *Id.*; Doc. 24-15 at 127 ¶ 13. This permanent replacement completed the project without incident. Doc. 24-2 at 16 ¶ 68. Not only was Wilson's permanent replacement nearly a decade older, but Wilson had himself replaced a 34-year-old apprentice from another IUEC local. *Id.* at 8 ¶ 35.

Wilson has not provided evidence from which a reasonable jury could conclude TK Elevator's stated reasons were pretext for age discrimination. Therefore, I find that summary judgment in favor of TK Elevator is also proper on Wilson's age discrimination claim.

## VI.     CONCLUSION

For the reasons set forth herein:

1.      Defendant TK Elevator Corporation's motion (Doc. 24) for summary judgment is **granted in its** entirety.  All claims asserted in this case by plaintiff Kenneth Wilson are **dismissed with prejudice.**

2.      **Judgment shall enter** against plaintiff Kenneth Wilson and in favor of defendant TK Elevator Corporation.

3.      The Clerk of Court shall **close this case.**

**IT IS SO ORDERED** this 26th day of November, 2025.

_____
Leonard T. Strand
United States District Judge